## WILMERDING a. MOONEY.

*New York Common Pleas; General Term, October,* 1860.

ARREST.—FALSE REPRESENTATIONS.—FRAUDULENT DISPOSAL OF PROPERTY.

Defendants upon the faith of their explicit representations that their stock of goods were worth $20,000, obtained, on the last day of October, a loan of $10,000 from the plaintiffs, positively assuring them that this loan would prevent their failure. On the 6th of January following, they transferred their stock to plaintiffs, on account of their indebtedness, representing the stock to be worth $9,000; but after appraisement, they consented that plaintiffs should credit them with $4,000 for it, and on a sale it brought even less. In an action to recover the remainder of the indebtedness, the plaintiffs caused the defendants to be arrested.

*Held,* that they were not entitled to discharge in the absence of definite explanations as to the deficiency in the amount of the stock which they had represented they had. Without such explanation it must be inferred that either they intentionally misrepresented the value of the property to get the loan, or afterwards made away with a large portion of the stock, with the design of defrauding their creditors.

Appeal from order denying motion to vacate arrest.

The moving papers were very voluminous, but their contents are stated in the opinion of the court.

By THE COURT.—DALY, J.—After a careful examination of this case, we are of opinion that the charge of fraud upon which the defendants have been arrested, is sustained. We think that no other conclusion can be arrived at but that, either the de-

fendants intentionally misrepresented the value of their stock and the state of their affairs, to get the loan of $10,000 from the plaintiffs; or, if their statement be true, and their stock was, at the time, of the value which they represented it to be, that they afterwards made away with a large portion of it with the design of defrauding their creditors.

On the 31st of October they induced the plaintiffs to make the loan by representing that their difficulty was but of a temporary nature; that they had then in their store, stock the value of which was over $20,000, and that with this loan of $10,000 they would be enabled to meet all their liabilities as they matured. The plaintiff, Humbert, urged them to examine their books carefully, and ascertain with certainty whether the loan would enable them to meet all their liabilities, for that the plaintiffs would not make it unless the defendants were certain that their failure would be averted by means of it, as the plaintiffs did not wish to create a new liability to be secured as a preferred debt in an assignment. The defendants reiterated their former statement, assuring the plaintiffs that $10,000 would make them completely safe, and that they would be able to meet all their liabilities, and repay the loan in the month of January following. Upon this assurance, the plaintiffs agreed to advance $10,000, taking the defendants' notes, payable in December, January, and February, and gave the defendants a check for $9,834.15, deducting the interest for the time which the defendants' notes had to run. A portion of the defendants' outstanding liabilities consisted of notes held by the plaintiffs, maturing within sixty days, and it was agreed that these notes should be discounted by the defendants, and paid out of the loan, which was done. After this positive assurance as to the state of their affairs, and of their ability to get through with the aid afforded them, the defendants, in fifteen days afterwards, came to the plaintiffs to ask a further loan of $3,000, which was very naturally refused after the statement they had made, and the positive knowledge which they professed to have of their financial condition. In ten days after, they failed.

On the 6th of January following, they transferred to the plaintiffs the stock then in their store, representing it to be of the value of $9,000. It was appraised by a clerk of the plaintiffs. He says that no invoice was shown him by the defend-

ants; that he minutely examined the goods, valuing each article; that his appraisement was $4,300 as the highest price which the goods were worth. After this appraisement was made, the defendants agreed that the plaintiffs might take the goods at $4,000. The plaintiffs did so, crediting the defendants to that amount, and sold them, the plaintiffs being auctioneers, at auction, unusual efforts being made to secure a good sale, and they brought $3,387.

The defendants swear that their stock in the month of October was of the value, at cost prices, of $24,000. If this was true, it was for them to show what had become of $20,000 within two months, or valuing what they transferred to the plaintiffs at their own estimate of $9,000, of at least $15,000 worth. They have put in a voluminous affidavit of over eighty folios, which is minutely particular in the elaboration of matters of little importance; but in respect to what became of the stock, a point upon which explanation was imperatively demanded to repel the charge upon which they have been arrested, they content themselves with the brief and summary statement, that · from the time of their failure they sold large portions of their stock for cash, which cash they used in making their payments; that they paid all the paper falling due before their failure except about $1,500, on which they got an extension; but not a single creditor to whom any payment was made is named. From the time of their failure until the 11th of January, they say that they paid off some judgments obtained against them, and compounded for some of their debts by paying a percentage in cash, and that they gave a small portion of their stock to one Walsh, in part payment of an indebtedness of $7,993. A search, instituted by the plaintiffs, shows judgment against them to the amount of $3,157, and the list of their creditors shows an indebtedness to the extent of $91,287.33. About one-third of their creditors, and to whom more than one-half of the amount was due, were called upon at the instance of the plaintiffs, that is, all that could be seen up to the time of the hearing of the motion, and the answers obtained were that they had received nothing, except in one instance, of a payment of $500. A statement could have been readily made from the defendants' books, and annexed to their affidavit, showing the creditors whom they paid, and the amount respectively paid to each, which would

have been worth more as an exposition of their affairs, and as a vindication of their character as honest merchants, than all that is contained in their bulky affidavit. The absence of any thing of the kind, and the substitution in its stead of general statements which it is easy to make and difficult to contradict, as no particular payment is specified, leads our mind to the conviction that it was their design to pay nobody, and that if they had, as they say, stock to the value of $24,000, the difference between that amount, and their own estimate of the value of that which they turned over to the plaintiffs, that is, $15,000 worth of goods, has been conveyed to their own use in fraud of their creditors, either by converting it into cash, or making some other disposition of it. They say they were indebted to Mr, Walsh in the sum of $7,993.80 for consignments made to them, and that they turned over to Walsh a small portion of their stock in part payment. This small portion, which by their own account paid but a part of this indebtedness, is augmented by their counsel to the full value of that indebtedness. Without any foundation for doing so, he fixes it as of the value of $7,993, and adding to that his clients' estimate of the value of what they turned over to the plaintiffs, $9,000, he adopts this way of accounting for $16,993 worth of the stock, telling us that the difference, $7,007, was not much for the sales of such a concern in two months. The omission of the defendants in their affidavit of all particulars in respect to the disposition of at least $15,000 worth of stock, or of the debts which they say they were engaged in paying, and have paid, may well be put in conjunction with their counsel's mode of accounting for this large amount of their property.

Up to the time of their arrest they did nothing towards providing for the creditors. They proposed to pay fifty cents on the dollar, which their creditors were generally willing to accept, but afterwards declined because some of their creditors, whom they do not name, would not take it, and because the value of their assets had depreciated by delay, and they did not think they could pay over twenty-five cents. They then offered that amount, but nothing came of it. They were asked to make an assignment for the benefit of creditors, and have not done so, giving as a reason that their counsel advised them not to do it, and that they believed that it would be better for their

creditors that they should not, inasmuch as the general experience of all mercantile men is, that when parties assign only book-debts and bills recoverable, they depreciate and prove uncollectable and worthless. For this reason they keep every thing in their own hands, disclosing nothing, and doing nothing for four months after their failure, except to dispose of their stock and to collect their debts; and then, when arrested for fraud, instead of a direct and business-like exposition of their affairs, they devote the main part of their affidavit to an attempt to convince us that the kindly act of the plaintiffs, in coming to their aid to enable them to meet their paper as it became due, was a mere trick on the part of the plaintiffs to get an ordinary business debt converted into a confidential one. If the defendants hoped by this means to divert our attention from the aspect which the case they have presented exhibits, wanting as it is in explanation, the most obvious and ordinary, they have deceived themselves, and the labor that has been devoted to the preparation of their long and elaborate affidavit has been wasted.

The order made at special term is affirmed.

---

## PHILLIPS *a.* SIMMONS.

*Supreme Court, First District; Special Term, October,* 1860.

### HUSBAND AND WIFE.—COSTS OF ACTION FOR DIVORCE.

If a wife who is plaintiff in an action for divorce discontinues it, or is defeated in it, and judgment is rendered against her, her husband is not liable for costs incurred by her therein.

Demurrer to complaint.

The action was brought by plaintiffs, who were attorneys and counsellors at law, to recover for services and disbursements.

The complaint stated that at a time named, the plaintiffs, on